### 68707. VINSON v. E. W. BUSCHMAN COMPANY.
(323 SE2d 204)

DEEN, Presiding Judge.

Appellant Leonard Vinson formerly worked for a local manufacturer's representative firm, selling conveyors and related items produced by several manufacturers, including appellee E. W. Buschman Company (Buschman), a Cincinnati-based firm with a nationwide clientele. When the owner of the local firm died, leaving no one to take over operation of the business, appellant and two fellow sales representatives approached Buschman officers regarding the possibility of Buschman's subsidizing the establishment of a new manufacturer's representative firm through which Vinson and his compeers would

continue to sell Buschman products on the same basis as they had done formerly; that is, as independent contractors compensated by a draw against commissions. Buschman proposed instead to open a district sales office in Atlanta, to be operated on the same basis as the firm's other district offices elsewhere in the country, with Vinson and the others as full-time Buschman employees, selling Buschman products exclusively, and with Vinson as district manager.

Vinson and his associates accepted this offer, and in late 1969 Buschman rented warehouse and office space, purchased appropriate furniture and equipment, hired secretarial and warehouse personnel, and established a petty cash account. Vinson and his associates[1] were paid a draw against commissions, with any discrepancy resolved at year's end; office and warehouse personnel were paid a salary or an hourly wage. All employees, including Vinson, participated in Buschman's retirement and profit-sharing plan, and income and social security taxes were withheld from the paychecks of each employee. Salaried and hourly personnel also received paid vacations, while commissioned personnel did not. Vinson was authorized to supervise the day-to-day operations of the district office; hiring of permanent or full-time personnel and certain other major decisions had to be cleared with Cincinnati, however. Vinson initially received permission to sell, in addition to Buschman products, a certain line of rack (an item which Buschman did not manufacture) which he had sold in his former job; permission was revoked after the first few years of the district office's operation, however. Personnel from the main office made brief visits to each district office, including Atlanta, approximately three times a year.

Shortly after the Atlanta district office was opened (not later than 1971), Vinson and McDonald, one of the two who had originally approached Buschman with Vinson, formed a business called Vinson-McDonald Conveyor Service, which operated out of the Buschman office and warehouse and used the Buschman secretary and warehouseman, the Buschman telephone and other supplies and equipment, and other Buschman-provided facilities. According to the evidence of record, Vinson-McDonald operated in direct competition with Buschman, selling not only Buschman equipment but that of competing manufacturers. Vinson-McDonald records were kept in a locked file cabinet to which only Vinson had a key; the secretary had to go to him whenever she needed stationery or forms bearing the Vinson-McDonald letterhead for processing Vinson-McDonald orders. Vinson-McDonald records were maintained by Vinson, with necessary typing

[1] One of the two subsequently severed his association with Buschman. The other, McDonald, was originally a party to the action below but died during the proceedings.

done by the secretary. Buschman neither knew nor, apparently, had reason to know of the existence of the competing enterprise.

Buschman became increasingly concerned with the Atlanta office's failure to expand its sales at the same rate as other district offices, particularly in the high-profit area of conveyor systems, as distinguished from single conveyors and parts. In response to home office queries, Vinson attributed the low volume of "system sales" to peculiar characteristics of the Atlanta market. In 1979 a salesman from the main office was transferred to Atlanta with special responsibility for system sales. He observed a certain tension in the atmosphere and reported to the home office that he had been expressly forbidden to enter Vinson's office, where, according to the testimony of other witnesses, the locked file cabinet had been moved shortly before the new salesman's arrival.

Prior to this incident, visiting personnel had noticed certain things which in retrospect seemed strange: Vinson, whose annual compensation from Buschman was about $35,000, was driving a new luxury automobile and living in an expensive house; and on an unannounced visit a company officer observed a competitor's conveyor sitting in the warehouse — a situation which Vinson explained by stating that he was merely holding it temporarily as an accommodation to a customer. What finally alerted Buschman to the real situation, however, occurred in mid-1979, when an Atlanta-area customer who had recently purchased the formerly permitted rack needed an additional quantity and called the Cincinnati office, which he understood to be the shipping point, rather than the district office. Top Buschman personnel immediately came to Atlanta, found the secret records and other evidence of the competing operation, and suspended Vinson and certain other employees; one was subsequently allowed to resign and the others, including Vinson and McDonald, were discharged. Buschman brought suit against Vinson and the others, alleging intentional, wilful, and malicious conduct involving bad faith and fraud in a number of tortious acts; and alleging especially that Vinson caused the others to conspire in an unlawful design to divert Buschman's business for their own benefit.

Buschman sought an injunction preventing the defendants from doing business with customers obtained while in the employ of Buschman, and an accounting of all Vinson-McDonald transactions, together with records thereof, during the defendants' period of employment. Buschman also sought compensatory damages of $750,000; punitive damages of $500,000; and expenses of litigation, including attorney fees, for "bad faith in respect to the unlawful acts alleged."

There was evidence that Vinson and McDonald had artificially inflated their commissions; that they had authorized personnel from the Atlanta office and warehouse to work on Vinson-McDonald instal-

lations and other jobs while indicating on their time-cards and expense reports that they were engaged in Buschman work; had padded orders by writing up unneeded parts and selling these to other customers; had kept a double set of orders and invoices on jobs involving Buschman products; and had otherwise affirmatively availed themselves of Buschman-provided business opportunities and facilities and concealed the same from Buschman. Vinson and others admitted engaging in such practices but insisted that, for various reasons, they were justified in doing so and that, moreover, they had done so in only some of their transactions rather than all.

McDonald died during the course of the proceedings, and the action against him was dismissed without prejudice. A jury found for Buschman and awarded the sum of $362,916.96, an amount equal to the sum of all proven Vinson-McDonald profits payable to Vinson during the years 1976-79 plus all commissions paid to Vinson during 1971-1979 — the period of the existence of the competing enterprise. The verdict did not specify whether this sum represented compensatory or punitive damages, or on what basis or bases it was computed. The court ordered all costs cast against the defendants.[2]

Vinson appeals from this judgment, enumerating as error the trial court's failure to grant his motion for directed verdict regarding his claim for commissions and appellee's claim for overhead; denial of his motions to strike certain of appellee's exhibits; and the court's giving certain jury instructions and failure to give certain others. *Held*:

1. Appellant assigns as error the trial court's denial of his motions for directed verdicts in his favor regarding Buschman's claim for recovery of commissions paid and overhead expenses of the district office during the period 1971-1979 — that is, the period during which the competing enterprise was in operation. The statutory criterion for the direction of a verdict is as follows: "If there is no conflict in the evidence as to any material issue and the evidence introduced, with all reasonable deductions therefrom, shall demand a particular verdict, such verdict shall be directed." OCGA § 9-11-50 (a).

The case at bar is unique in Georgia law as regards the number and duration of violations of the duty owed by an agent to his principal. OCGA § 23-2-58; *Koch v. Cochran*, 251 Ga. 559 (307 SE2d 918) (1983); *Larkins v. Boyd*, 205 Ga. 69 (52 SE2d 307) (1949). It is well established in this state, however, as well as in other jurisdictions, that such breach of fiduciary duty negates the unfaithful agent's right

---

[2] The jury found in the amount of approximately $55,000 against a co-defendant, Stanley Angle, a former business associate of Vinson and McDonald whom Vinson had recruited as an employee of both Buschman and Vinson shortly after the latter enterprise was established. Angle did not appeal the judgment.

to any compensation and renders him liable to his principal for his dealings with the latter's property. OCGA §§ 10-6-24; 10-6-25; 10-6-31. See, e.g., *Franco v. Stein Steel &c. Co.*, 227 Ga. 92 (179 SE2d 88) (1970); *Harrison v. Harrison*, 214 Ga. 393 (105 SE2d 214) (1958). Georgia law is thus in accord with the American Law Institute's Restatement Second of Agency and with decisions in other jurisdictions. See Restatement Second of Agency, § 387 et seq., together with the comments under each section. See also, e.g., Ability Search v. Lawson, 556 FSupp. 9, aff'd 697 F2d 287 (D.C.N.Y. 1981); Grace v. E. J. Kozin Co., 538 F2d 170 (7th Cir. 1976); Vendo Co. v. Stoner, 58 Ill.2d 289 (321 NE2d 1) (1974); Lawson v. Baltimore Paint & Chemical Corp., 347 FSupp. 967 (D.Md. 1972); Anderson Cotton Mills v. Royal Mfg. Co., 221 N.C. 500 (20 SE2d 818) (1942).

In view of the wealth of evidence presented in the court below as to appellant's multiple violations of his fiduciary duty to Buschman, his principal, it cannot be said that the evidence demanded the direction of a verdict for appellant. Appellant's enumerations numbered A-1 and C-1 are devoid of merit.

2. Our review of the record indicates that the exhibits which were the subject of appellant's motions to strike constituted clearly admissible evidence. Therefore, the trial court's denial of the motion was not error, and appellant's enumerations numbered A-2, B-1, and C-2 are without merit. Moreover, questions of relevancy and admissibility are for the Court. *Church's Fried Chicken v. Lewis*, 150 Ga. App. 154 (256 SE2d 916) (1979). The Georgia rule concerning admissibility of evidence which is challenged on grounds of relevancy is that it be admitted, and its weight be determined by the jury. *Harris v. McClain*, 152 Ga. App. 447 (263 SE2d 233) (1979); *Calhoun v. Branan*, 149 Ga. App. 160 (253 SE2d 838) (1979).

3. The trial court must give jury instructions on all issues raised by the pleadings or the evidence; the instructions should be adjusted to the evidence actually presented at trial. See, e.g., *Downside Risk v. MARTA*, 168 Ga. App. 202 (308 SE2d 547) (1983); *Fowler v. Gorrell*, 148 Ga. App. 573 (251 SE2d 819) (1978); *Berger v. Plantation Pipeline Co.*, 121 Ga. App. 362 (173 SE2d 741) (1970).

The record in the case *sub judice* reveals that the three jury instructions enumerated as error are all correct statements of relevant Georgia law. Request # 5 states: "I charge you that an unfaithful agent is entitled to no commissions. If you find that Vinson, Angle, or either of them, were unfaithful agents of Buschman, regardless of whether you also find that they were employees of Buschman, then those among them who were unfaithful may not retain any compensation they received from Buschman . . . during the period you find them to have been unfaithful to Buschman." This charge is based on OCGA § 10-6-31, which states in pertinent part, "If [the agent] shall

have violated his engagement, he shall be entitled to no commission," and on relevant case law; e.g., *Harrison v. Harrison,* supra; *Williams v. Moore-Gaunt Co.,* 3 Ga. App. 756 (60 SE 372) (1908).

Likewise, Request # 6, which states that an unfaithful agent is not entitled to retain the profits of an enterprise operated in competition with the principal's business, is soundly based on the Code and case law. OCGA § 10-6-24 expressly prohibits self-dealing and the fraudulent potential with which it is fraught: "Without the express consent of the principal after a full knowledge of all the facts, an agent employed to sell may not himself be the purchaser; and an agent to buy may not himself be the seller." OCGA § 10-6-25 decrees: "The agent shall not make a personal profit from his principal's property; for all such he is bound to account." *Franco v. Stein Steel &c. Co.,* supra; *Kellett v. Boynton,* 87 Ga. App. 692 (75 SE2d 292) (1953).

Request # 7 reads in pertinent part as follows: "I charge you that a breach of duty by an agent owed to his principal which thereby causes the principal to suffer a disadvantage and the agent to obtain a benefit is a fraud which prevents the agent from taking or retaining the benefit." This instruction, too, is based on well-settled principles expressed in case law; e.g., *Harrison v. Harrison,* supra; *Peevy v. Wilkes,* 48 Ga. App. 114 (172 SE 108) (1933). Like the other challenged jury instructions, this one is consistent with the facts of the case at bar as well as with the law. The enumerations designated A-3, B-2, and C-3 are therefore without merit.

*Judgment affirmed. McMurray, C. J., and Sognier, J., concur.*

Decided September 18, 1984 — Rehearing denied October 2, 1984

*Charles W. Smegal,* for appellant.
*Robert M. Travis, Robert L. Connelly, Jr., Terese E. Peisner, David J. Llewelyn,* for appellee.