### A99A0079. JENNETTE v. NATIONAL COMMUNITY DEVELOPMENT SERVICES, INC.
(520 SE2d 231)

SMITH, Judge.

Mark L. Jennette appeals from rulings of the trial court in favor of National Community Development Services, Inc. ("NCDS"), in an action brought by NCDS against Jennette alleging that while acting as NCDS's agent, Jennette breached various agreements and his fiduciary duties of "loyalty, good faith, honesty, and fair dealing" by diverting business to himself. Jennette answered the complaint, alleging that the agreements were not enforceable and denying agency and breach of fiduciary duty. He also asserted several counterclaims. The parties filed cross-motions for summary judgment, and the trial court denied summary judgment to either party on all issues with the exception of Jennette's counterclaims for conversion and punitive damages. As to those, the trial court granted summary judgment to NCDS. The case was then tried by the court without the intervention of a jury, resulting in a judgment in favor of NCDS in the amount of $235,000. On appeal, Jennette contends the trial court erred in finding that an agency relationship existed between the parties, in awarding damages to NCDS, in awarding summary judgment to NCDS on his counterclaim for conversion, and in failing to award summary judgment in his favor for sums due him as compensation. We find no error, and we affirm the judgment.

The record shows that NCDS is in the business of creating and managing fund raising campaigns for nonprofit entities, including chambers of commerce, colleges and universities, and economic development organizations. This case arose out of business transactions that occurred while Jennette was working as an independent contractor "senior associate" for NCDS, developing projects for customers. When Jennette expressed interest in developing new busi-

ness, Howard C. Benson, NCDS's Chief Executive Officer, offered to pay him a commission of ten percent of the gross revenue realized by NCDS on business he developed if he acted as NCDS's representative in developing business. Other independent contractors were paid similar "finder's fees."

In the fall of 1993, one such customer, Macon College, contacted NCDS and asked to have a representative visit its campus to discuss fund raising services. Benson asked Jennette to visit the college and attempt to secure the college's fund raising business for NCDS. Jennette met with the college's Vice President for Business Affairs, Jack Ragland, who was also the Treasurer of the Macon College Foundation. The college decided to hire NCDS. Additionally, during that fall, he secured for NCDS the business of conducting feasibility studies for Darton College and the Albany State College Foundation. He also made contacts on behalf of NCDS with a group of organizations comprised of Wesleyan College, Andrew College, and the Georgia United Methodist Commission on Higher Education & Campus Ministry ("the Methodist Group") concerning a feasibility study.

On January 6, 1994, while Jennette was in Huntsville, Alabama, working on a fund raising campaign for NCDS, Benson traveled to Huntsville to work out some problems with the campaign. At that meeting, Jennette informed Benson that the Huntsville campaign would be his last for NCDS, and that when the Huntsville campaign was over, he would begin working on his own. No discussion took place regarding how clients and potential clients would be handled when Jennette began working on his own. Toward the end of January 1994, Jennette formed a sole proprietorship called Advancement & Development Services ("ADS").

In February 1994, Jennette submitted a proposed contract with NCDS for the first phase of the Macon College project, a feasibility study. He visited Macon College to pick up the college's check for $15,000, in payment for the feasibility study. But he refused to accept a check payable to NCDS and instructed Ragland to void that and write another check, payable to ADS. Jennette told Ragland that NCDS had been split, with one division doing more development commission work and the other doing more for nonprofit organizations. Ragland testified that Jennette said ADS had been set up as a special division; Ragland believed it was still part of NCDS. Jennette substituted ADS for NCDS not only on the check, but also in the written agreements covering the fund raising project.

On the same day, Jennette sent a proposal to Dr. Billy Black, President of Albany State College, for a fund raising campaign to be conducted by ADS. This proposal was accepted on March 14, 1994. Dr. Black testified, by affidavit read into the record by stipulation at trial, that when Jennette presented the proposal he understood that

ADS was a separate organization, but he thought it would be "affiliated" with NCDS. On February 22, 1994, Jennette presented a proposal for a fund raising feasibility study to the Methodist Group, which was accepted the same day. At the time the Methodist Group entered into the contract with ADS, it was under the impression that ADS was a division or branch of NCDS. This group paid ADS for the feasibility study but never went forward with a fund raising campaign.

In April 1994, Jennette informed Macon College that ADS and NCDS would not affiliate in conducting campaigns, and in July 1994, Macon College entered into a contract with ADS for a fund raising campaign. The total receipts received by ADS from Macon College, Albany State College, and the Methodist Group for all studies and campaigns after January 6, 1994, was $235,000.

1. NCDS's request that we impose a penalty for frivolous appeal is denied.

2. In three enumerations, Jennette contends the trial court erred in concluding that he was an agent for NCDS at any time, after January 6, 1994, and after March 1994. He argues that NCDS was unable to prove the requirements for an agency relationship because it could not show that Jennette had the authority to bind NCDS, which is "[a]n essential characteristic of an agent." *Gen. Warranty Corp. Ins. Agents &c. v. Cameron-Hogan, Inc.*, 182 Ga. App. 434, 436 (1) (356 SE2d 83) (1987).

"An agency relationship arises wherever one person, expressly or by implication, authorizes another to act for him." (Citation and punctuation omitted.) *Atlanta Market Center Mgmt. Co. v. McLane*, 269 Ga. 604, 606 (1) (a) (503 SE2d 278) (1998). But to be an agent, one must be "more than the employee delegated . . . to look after certain accounts." Id. One must have " 'authority, real or ostensible, to create obligations on behalf of' " the principal, " 'bringing third parties into contractual relations with' " it. Id. The record shows that Jennette did have that authority. Contrary to Jennette's argument, the fact that he was hired as an independent contractor is not dispositive of this issue. As pointed out by NCDS, the terms "independent contractor" and "agent" are neither antonyms nor mutually exclusive. Jennette had both actual and ostensible authority to bind NCDS. He was authorized to sign contracts on behalf of NCDS. Benson testified that Jennette had the authority "[t]o obligate the corporation to perform the work as outlined in a proposal." Jennette himself admitted signing agreements on behalf of the company. It also appeared to clients that he had that power. No doubt exists that Jennette was known to these clients as an NCDS agent and that the clients themselves, in several cases, believed they were dealing with NCDS when they dealt with Jennette.

As NCDS's agent, Jennette was under a duty not to make a per-

sonal profit from the principal's business, OCGA § 10-6-25, or from the knowledge obtained from the relationship, to the principal's injury. *Koch v. Cochran*, 251 Ga. 559, 560 (307 SE2d 918) (1983). He owed to NCDS the fiduciary duties of loyalty and good faith. Id.

Further, unlike the agents in *Gen. Warranty Corp.* and *Atlanta Market Center*, Jennette did not merely compete with a former principal; he deliberately used deception and misrepresentation to obtain for himself business and funds intended for the alleged principal. It is clear from the evidence that Jennette specifically held himself and/ or ADS out to clients as "affiliated" with or a "division" of NCDS, when he knew this was not true, that he did so to secure the clients' business, and that he converted payments intended for and belonging to NCDS.

Even those commitments made to ADS later in the year, by organizations who by then knew that ADS was a separate entity, were made because of the original deception. For example, a representative of Macon College testified that because Jennette had done the feasibility study he knew "where the money is, so that you — you are waiving your money if you don't go with that firm to do the complete campaign." NCDS therefore would be entitled to recover these payments on its claim for conversion or money had and received. See, e.g., *Kellett v. Boynton*, 87 Ga. App. 692 (75 SE2d 292) (1953) (action for money had and received by disloyal agent).

3. Jennette maintains that the trial court erred in awarding damages to NCDS in the amount of $235,000. He argues that only an amount equal to ADS's profit should have been awarded and that NCDS failed to prove this amount with any degree of certainty. We do not agree.

As plaintiff, NCDS had the burden of proving its damages with reasonable certainty. *Post Realty Assoc. v. DSL Assoc.*, 228 Ga. App. 678, 679 (492 SE2d 600) (1997). The factfinder must be able to calculate the amount of damages from the evidence presented, since an award may not be based upon guesswork. *Gen. Warranty Corp.*, supra at 437 (4). But it is undisputed that $235,000 is the amount of gross revenue received by Jennette from the diverted business. The gross revenue rightfully belonged to NCDS, and Jennette misappropriated it. The amount of the gross revenue therefore was correctly awarded to NCDS.

Contrary to Jennette's argument, *Vinson v. E. W. Buschman Co.*, 172 Ga. App. 306 (323 SE2d 204) (1984) does not stand for the proposition that an agent's breach of fiduciary duty entitles the principal to recover only the agent's profits, not the gross receipts. In fact, *Vinson* states that the law is clear in Georgia, as well as in other jurisdictions, that "breach of fiduciary duty negates the unfaithful agent's right to any compensation and renders him liable to his principal for

his dealings with the latter's property. [Cits.]" Id. at 309-310 (1).

Jennette also argues that in the alternative, NCDS's recovery could be measured by its loss of anticipated profits, citing the general principle that NCDS should not be placed in a better position than it would have been had the "contract" not been breached. But this general contract principle is not applicable to these facts. If it were, it would conflict with the statutory provision prohibiting the recovery of commission by an unfaithful agent. OCGA § 10-6-31.

4. Jennette asserts that the trial court erred in granting summary judgment to NCDS on his counterclaim for conversion of a computer he left in the office he was using in Huntsville. Benson testified on his deposition that when Jennette left Huntsville, he essentially "shut down" the campaign NCDS was conducting there. He took the central processing unit of Jennette's computer, containing essential information about the campaign, leaving the monitor, keyboard, and some personal items in the office. After Jennette counterclaimed for the items he left in his office, these items were turned over to Jennette's attorney. At the time he was deposed, Benson indicated that no items belonging to Jennette were in his possession. Jennette came forward with nothing disputing this evidence. Contrary to the assertion in Jennette's brief, the trial court's "assumption" that NCDS's possession of Jennette's property was lawful in the first instance was fully warranted by Benson's testimony at his deposition that Jennette left the property in the office of NCDS. This was not disputed or contradicted by Jennette. To establish a prima facie case for conversion, Jennette was required to show title to the property or the right of possession, actual possession in NCDS, demand for its return, and refusal by NCDS. *Charter Mtg. Co. v. Ahouse*, 165 Ga. App. 497, 498 (2) (300 SE2d 328) (1983). Once evidence was presented that Benson returned the computer monitor and other property belonging to Jennette, Jennette could not rely on the allegations of conversion in his counterclaim. He was required to come forward with evidence supporting the elements of his case or suffer summary judgment against him. *T & R Custom v. Liberty Mut. Ins. Co.*, 227 Ga. App. 144, 146 (2) (488 SE2d 705) (1997). Jennette failed to do this, and the trial court did not err in entering summary judgment against him on this claim.

5. Jennette contends the trial court erred in declining to award him $1,922.77 on his counterclaim for work performed for NCDS as an independent contractor in the Huntsville campaign. This claim was tried, and the trial court rendered judgment for NCDS on the claim.

The evidence at trial was sufficient to support the trial court's judgment on this issue. Evidence was presented that the Huntsville campaign was in trouble; that because Jennette had been directing his attention to ADS while heading the Huntsville campaign for

NCDS, Jennette accomplished "virtually no work . . . of any substance" in Huntsville; and that NCDS was forced to send another team to Huntsville and work for about four months with no fee to "clean up the mess." Under these circumstances, we cannot say the trial court erred in concluding that Jennette was not entitled to further compensation for that campaign.

*Judgment affirmed. Pope, P. J., and Eldridge, J., concur.*

DECIDED JUNE 28, 1999 —
RECONSIDERATION DENIED JULY 19, 1999.

*Julian M. Treadaway*, for appellant.
*Chorey, Taylor & Feil, Jeffery T. Coleman*, for appellee.