## A02A1443. CORBIN v. REGIONS BANK.
(574 SE2d 616)

RUFFIN, Presiding Judge.

Regions Bank ("Regions") sued Earl M. Corbin to recover a deficiency under a retail installment contract after it repossessed and sold the vehicle securing that contract. Corbin counterclaimed, asserting, among other causes of action, claims for wrongful repossession, conversion, and defamation.[1] The trial court granted partial summary judgment to Regions on these counterclaims, and Corbin appeals. For the reasons that follow, we affirm the trial court's grant of summary judgment to Regions on Corbin's defamation counterclaim, but we reverse as to Corbin's wrongful repossession and conversion counterclaims.

In reviewing a grant of summary judgment, we conduct a de novo review of the evidence.[2] To prevail at summary judgment under OCGA § 9-11-56 (c), Regions must demonstrate the absence of any genuine issue of material fact and that the undisputed facts, viewed most favorably toward Corbin, warrant judgment as a matter of law.[3]

When so considered, the evidence shows that on October 17, 1995, Corbin entered into a 60-month retail installment contract (the "contract") with Duvall Ford Company, Inc. ("Duvall") to purchase a used 1995 Chevrolet S10 truck. The contract contained an option to purchase credit disability insurance, and Corbin elected to obtain the insurance at a cost of $1,090.65. Duvall was an authorized agent of Life of the South, which issued the disability policy. Corbin's monthly payment of $336.62 included the cost of financing the insurance over the life of the loan. After executing the contract, Duvall assigned it for value to the Bank of Clayton. Regions ultimately became the

---

[1] Corbin made several other counterclaims that are not subject to this appeal. He asserted counterclaims for breach of contract and breach of fiduciary duty, but the trial court denied Regions' motion for summary judgment on these claims. Corbin also raised but then dismissed a counterclaim for fraud. The trial court also granted summary judgment to Regions on Corbin's claim of a commercially unreasonable sale of collateral because Regions dismissed the original deficiency action.

[2] See *Carter v. Tokai Financial Svcs.*, 231 Ga. App. 755 (500 SE2d 638) (1998).

[3] See id.

secured party under the contract when the Bank of Clayton's successor merged with Regions in June 1996.

In 1997, Corbin suffered two heart attacks, two strokes, and a broken leg. Corbin's medical problems prevented him from working, and he was unable to pay the monthly installments due under the contract. In May 1997, Regions mailed Corbin a notice of repossession. According to notations entered in Regions' collection file, Corbin was told that he had to turn the truck in at the branch office. In June 1997, Corbin gave the keys to Jerry Rogers, the branch vice-president. Corbin told Rogers he was "disabled by his doctors" and unable to make the payments, and Rogers expressed his sympathy.

When Corbin surrendered his truck to Regions, he did not mention the disability policy or submit any written documentation indicating that he was disabled. Corbin testified that he was never mailed a copy of the policy and that he voluntarily turned the truck in because he did not remember purchasing the insurance.

Regions had no actual knowledge of the policy. Richard J. Malcolm, Jr., Regions' vice-president of recovery operations, testified that Corbin's loan was an "indirect loan" made through a dealership where the dealer is the creditor on the loan. Malcolm explained that after Regions purchases such a loan from a dealership, no entry is made in the bank's computer system about credit disability insurance. However, Carol Jackson, a debt collector employed by Regions, testified that Corbin's account file had a copy of the installment contract and a copy of the certificate of insurance issued by Life of the South.[4]

In July 1997, Regions notified Corbin by certified mail that it planned to sell the truck at a public sale and recover any deficiency. Corbin did not respond to the notification, and Regions sold the truck at a private, dealers-only auction, which resulted in the recovery of $6,390 after expenses. That amount was applied to the remaining loan balance.

Notwithstanding its repossession and sale of the truck, Regions' collection department continued to contact Corbin demanding payment. In August 2000, more than three years after Regions repossessed the truck, it sued Corbin for the deficiency. After being served with the complaint, which incorporated a copy of the contract, Corbin realized that he had purchased credit disability insurance. Corbin

---

[4] The certificate identifies Corbin as an "Insured Debtor" and the amount of the monthly benefit as $336.62, the amount of Corbin's scheduled monthly payment. The certificate of insurance became effective on October 17, 1995, the date Corbin executed the documents with Duvall, and coverage was to continue for the term of the loan, until November 1, 2000. The certificate designates Regions' predecessor Bank of Clayton as the "CREDITOR – FIRST BENEFICIARY." At the bottom of the certificate appear the words: "CREDITOR'S COPY."

returned to Regions with his son-in-law and again met with Rogers. Corbin testified that when Rogers read the contract, he suggested that Corbin obtain a claim form from Regions' main office and take it to his doctor. According to Corbin, Rogers offered to mail the completed paperwork personally. Ultimately, Corbin's attorney submitted the claim form to Life of the South, and the insurance company paid the policy limits of $13,992.18 into the registry of the court.

On June 27, 2001, Regions voluntarily dismissed its deficiency action against Corbin. Shortly thereafter, Regions sought summary judgment on Corbin's counterclaims. Relying upon evidence that indicated Corbin had "voluntarily returned the vehicle to plaintiff's parking lot," the trial court awarded summary judgment to Regions on Corbin's wrongful repossession claim. For the same reason, the court found Corbin's claim for conversion necessarily failed. As to the claim for defamation, the trial court observed, "the record shows that defendant failed to make payments on the contract, and the vehicle was repossessed. Truth is a defense to a defamation claim." This appeal ensued.

1. Corbin contends that the trial court erred in concluding, as a matter of law, that he consented to the repossession of his truck so as to bar his claim for wrongful repossession. We agree.

"Unless otherwise agreed a secured party has on default the right to take possession of the collateral,"[5] without judicial process, provided that it can do so without breach of the peace.[6] However, a wrongful repossession occurs when the repossession is accompanied by "an act that is in contravention of some legal duty owed to the party from whose possession the vehicle is being taken."[7] In the context of a wrongful repossession, a wrongful act means "any act which in the ordinary course will infringe upon the rights of another to his damage, unless it is done in the exercise of an equal or superior right."[8] When the term wrongful is "used as an element of this tort, [it] is used in its more comprehensive sense to include that conduct which is in contravention of some legal duty owed to the party from whose possession the vehicle is being taken."[9]

In this case, a jury could conclude that Regions breached its legal duty to Corbin under the contract when it repossessed the truck

---

[5] OCGA § 11-9-503 (2000) (replaced by OCGA § 11-9-609, enacted by Ga. L. 2001, p. 362, § 1).

[6] See *Fulton v. Anchor Sav. Bank*, 215 Ga. App. 456, 460 (2) (a) (452 SE2d 208) (1994) (physical precedent only).

[7] (Punctuation omitted.) *Borden v. Pope Jeep-Eagle*, 200 Ga. App. 176, 179 (3) (407 SE2d 128) (1991).

[8] (Punctuation omitted.) *Hopkins v. First Union Bank*, 193 Ga. App. 109, 113 (2) (b) (387 SE2d 144) (1989).

[9] Id.

without first seeking payment under the credit disability insurance. The contract shows on its face that Corbin purchased the optional credit disability insurance. The contract also provides that the "Creditor may claim benefits" under these optional insurance contracts. Regions paid Duvall for the contract and became the holder. The contract states that the holder is subject to defenses which could be asserted against the seller.

Rights and duties under a contract are generally freely assignable.[10] Regions had a right under the contract to payments from Corbin. In addition, Regions received a certificate from Life of the South showing that it was the creditor beneficiary and loss payee under the disability insurance policy. The contract gives Regions the right to repossess the truck if Corbin fails to make his payments or "break any of the agreements in this contract (default)."

What constitutes a default must be determined from the context of the agreement.[11] For example, we recently considered a contract that allowed the secured party to repossess the collateral, a truck, if it "was damaged, destroyed, or stolen."[12] The contract also required the debtor to insure the collateral and name the creditor as loss payee. After the truck was damaged in a collision, the creditor repossessed it, relying in part on the damage default clause, and the debtor sued for wrongful repossession of the collateral. The trial court granted summary judgment to the creditor, but we reversed.[13] We found that, notwithstanding the damage default clause, "the agreement clearly contemplate[d] that insurance proceeds would be used to repair the collateral in a reasonable and timely fashion without the damage constituting an automatic default."[14]

This case involves similar circumstances. Although the contract allowed Regions to repossess the collateral if Corbin failed to make timely payments, it also provided Corbin with credit disability insurance naming the creditor as the loss payee. Thus, in light of evidence showing that Corbin notified Regions that he could not make payment due to a disability, a jury could find that no default occurred — the agreement contemplated that the credit disability insurance would remedy Corbin's inability to pay.[15]

---

[10] See, e.g., *Decatur North Assoc. v. Builders Glass*, 180 Ga. App. 862, 865 (2) (350 SE2d 795) (1986); OCGA § 44-12-22.

[11] See *Whisenhunt v. Allen Parker Co.*, 119 Ga. App. 813, 818-819 (4) (168 SE2d 827) (1969) (physical precedent only).

[12] See *Rogers v. Farmers & Merchants Bank*, 247 Ga. App. 631, 632 (545 SE2d 51) (2001).

[13] See id. at 633.

[14] Id.

[15] See id.

Regions argues that it was Corbin's responsibility to make a claim under the insurance policy. This argument would be more persuasive if Corbin had purchased the insurance on his own. However, Corbin purchased the insurance as part of the contract, and the contract gives Regions the right to claim benefits under the insurance policy. Regions has not pointed to evidence showing that Corbin had expressly agreed, either under the contract or the insurance policy,[16] to initiate a disability claim with the insurer. Under the circumstances, a jury could conclude that the insurance was such an integral part of the contract that the holder was obligated to look first to the insurance for payment if it was aware that Corbin was disabled. It follows that the evidence would allow a jury to conclude that Regions had no right to repossess Corbin's truck under the contract.

Although the issue of whether a creditor is obligated to seek payment under a credit disability insurance policy sold with an automobile financing contract appears to be one of first impression in Georgia, other state appellate court decisions are consistent with our conclusion here. In *Carter v. U. S. Nat. Bank of Oregon*,[17] the Oregon Court of Appeals found that the "purchase of disability insurance from the creditor constituted an implied agreement that, before repossessing, the creditor would look first to collecting under the insurance, if it was aware of a possible claim." Thus, in *Carter*, the court affirmed the trial court's ruling that the assignee of an automobile financing contract was obligated to ascertain if the debtor had a claim under the credit disability insurance sold with the financing contract before repossessing the vehicle.[18] Similarly, in *Wiley v. Gen. Motors Acceptance Corp.*,[19] the Supreme Court of Alabama considered whether the creditor "had a right to repossess and resell the car upon [the debtor's] default without regard to the fact that she had elected to obtain the disability insurance policy mentioned in the [finance] contract." Like the court in *Carter*, the Alabama court framed the issue as whether the credit disability insurance created an implied promise by the creditor "that it would not declare a nonpayment default if [the debtor] became disabled and gave [the creditor] notice, so long as [the debtor] complied with the terms of the disability

---

[16] The disability insurance is part of a group policy, and a copy of, or applicable excerpts from, that group policy does not appear in the record.

[17] 95 Ore. App. 305, 308 (768 P2d 930) (1989).

[18] Id.; see also *Bank One Milwaukee v. Harris*, 209 Wis.2d 412, 418 (563 NW2d 543) (1997) ("We conclude . . . that . . . all consumers purchasing disability insurance in conjunction with a consumer installment agreement would reasonably expect the insurance to cover their most immediate need – the next monthly payment due – to assure they will not be in default.").

[19] 624 S2d 518, 521 (Ala. 1993).

insurance agreement."[20] In ruling that a jury issue existed on the debtor's conversion claim against the creditor, the court reasoned:

> [The debtor] was given the opportunity to buy credit disability insurance as part of an installment sale and . . . she chose to buy the insurance to protect her against the very act that [the creditor] caused to occur — repossession and resale of her automobile. Considering these facts, could [the debtor] reasonably expect that her car would not be repossessed if she was in fact disabled? . . . We answer . . . in the affirmative.[21]

In this case, Regions nevertheless contends that it did not wrongfully repossess the truck because the salient evidence showed that Corbin voluntarily returned the truck to Regions. Regions asks us to consider authority such as *Fulton v. Anchor Sav. Bank*, which shows that an action for wrongful repossession will not lie if a debtor does not protest the repossession of collateral.[22] But the issue in *Fulton* and similar cases is whether the creditor breached the peace during a repossession.[23] This presupposes that the creditor was otherwise justified in repossessing the collateral. Here, a jury could find that the repossession was itself wrongful as a breach of Regions' contractual obligations. Accordingly, the trial court erred in granting summary judgment to Regions on Corbin's wrongful repossession claim.[24]

2. We also agree with Corbin that the trial court erred in concluding that his voluntary surrender of the truck foreclosed his cause of action for conversion.

"Conversion consists of an unauthorized assumption and exercise of the right of ownership over personal property belonging to another, in hostility to his rights; an act of dominion over the personal property of another inconsistent with his rights; or an unauthorized appropriation."[25] An essential element of the tort of conversion is the "unauthorized appropriation of personal property" belonging to

---

[20] Id.

[21] Id.

[22] See note 6, supra.

[23] See id.; see also OCGA § 11-9-609.

[24] See *Hopkins*, supra; see also *Ford Motor Credit Co. v. Milline*, 137 Ga. App. 585, 588-589 (1) (224 SE2d 437) (1976).

[25] (Citation, punctuation and footnote omitted.) *Tidwell v. Tidwell*, 251 Ga. App. 863, 864-865 (554 SE2d 822) (2001); see also *Jennette v. Nat. Community Dev. Svcs.*, 239 Ga. App. 221, 225 (4) (520 SE2d 231) (1999) (prima facie case for conversion requires showing that plaintiff had title to the property or the right of possession, actual possession in the converter, demand for return and refusal).

another.[26] Generally, "when someone comes into lawful possession of personal property, in the absence of a demand for its return and a refusal to return the personal property, there is no conversion."[27]

Regions argues that there was no unauthorized appropriation. Corbin offered no protest when he left the truck in Regions' possession, and Corbin admitted in his deposition that he had voluntarily taken the truck to the branch and surrendered the keys. However, we cannot say an action for conversion must fail merely because Corbin surrendered the truck. As stated above, a jury could conclude that in light of the disability insurance policy, Regions had no right under the contract to demand possession of the truck and sell it at auction.[28] Corbin may have been under the impression that Regions had the right to take the truck, but the act of handing the keys to the branch manager, especially after Regions' communications to Corbin effectively informed him he had no choice in the matter, was not necessarily an independent authorization by Corbin for Regions to take and sell his truck regardless of the parties' obligations under the contract. Furthermore, because Regions sold the truck and retained the proceeds, Corbin was not required to demand the truck's return to show that Regions exercised a right of ownership over it.[29] Thus, regardless of whether Corbin gave Regions the keys, Regions appropriated the truck for its own use. As the evidence would allow a jury to find an unauthorized taking by Regions of Corbin's truck, the trial court erred in granting summary judgment to Regions on Corbin's conversion counterclaim.

3. Corbin asserts that the trial court erred in granting summary judgment to Regions on his defamation claim. Corbin's claim is based on Regions' report to three major credit bureaus that the vehicle was repossessed and that Regions suffered a loss. The evidence shows that Regions made electronic reports to the agencies on a periodic basis and as part of its ordinary course of business. Corbin argues that, due to the credit disability insurance, he was not in default, Regions was not entitled to repossess his truck, and Regions' report to credit bureaus about the repossession and loss was defamatory. Corbin also maintains that the report of repossession "implies that the repossession was proper due to default; it is not a value neutral report."

---

[26] *Lamb v. State Farm &c. Ins. Cos.*, 240 Ga. App. 363, 365 (1) (522 SE2d 573) (1999).

[27] *Taylor v. Powertel, Inc.*, 250 Ga. App. 356, 358 (2) (551 SE2d 765) (2001).

[28] See, e.g., *Howard v. S.C. Nat. Bank*, 288 S.C. 421, 424 (343 SE2d 41) (App. 1986) ("A secured party commits a conversion when he takes possession of collateral and disposes of it before he is entitled to it under the terms of the security agreement.").

[29] See 18 AmJur2d 205, Conversion, § 84 (1985) ("Demand and refusal are never necessary, except to furnish evidence of the conversion.").

OCGA § 51-5-1 (a) defines libel as "a false and malicious defamation of another, expressed in print, writing, pictures, or signs, tending to injure the reputation of the person and exposing him to public hatred, contempt, or ridicule." The trial court granted summary judgment to Regions, reasoning that the report was true. But pretermitting whether Regions' truth defense bars the claim, we find that the issue of whether summary judgment was appropriate on Corbin's defamation counterclaim is satisfactorily resolved under the Federal Fair Credit Reporting Act (the "Act").[30] The Act limits state law defamation claims that are based on credit reports:

> The Federal Fair Credit Reporting Act, [cit.], preempts state defamation laws to the extent that those laws are inconsistent with any provision of the Fair Credit Reporting Act. Under the Federal Fair Credit Reporting Act, anyone who furnishes information to a consumer reporting agency is immune from state law defamation actions except as to false information furnished with malice or willful intent to injure such consumer.[31]

The issue was raised below, and neither party contested the application of the Act. In moving for summary judgment on Corbin's defamation claim, Regions argued that there was no evidence of malice or intent to injure on its part. Corbin responded that malice, for purposes of the Act, is shown if the information is communicated when the reporter knew it was false or acted in reckless disregard for its truth or falsity.[32] Corbin argued that Regions was reckless in its report of Corbin's default. But "[r]eckless disregard . . . requires evidence that the speaker entertained actual doubt about the truth of the statement,"[33] and the record in this case contains no evidence that Regions doubted the truth of its report. The evidence shows that Regions made the report in the ordinary course of its business after Corbin surrendered the truck without protest. Even if a jury may ultimately determine that repossession was wrongful, there is still no evidence that Regions intended to harm Corbin or doubted the report's veracity. Because the trial court's decision will be affirmed if it is right for any reason,[34] and there is no evidence of malice, the trial court correctly awarded summary judgment to Regions on Corbin's defamation counterclaim.

---

[30] 15 USC § 1681 et seq.

[31] (Citations, punctuation and emphasis omitted.) *Gibson v. Decatur Fed. Sav. &c. Assn.*, 235 Ga. App. 160, 164-165 (2) (508 SE2d 788) (1998); see 15 USC § 1681h (e); see also *Nicholl v. NationsBank of Ga.*, 227 Ga. App. 287, 290 (2) (488 SE2d 751) (1997).

[32] See *Wiggins v. Equifax Svcs.*, 848 FSupp. 213, 223 (III) (B) (D. D.C. 1993).

[33] Id.

[34] *Abellera v. Williamson*, 274 Ga. 324, 326 (2) (553 SE2d 806) (2001).

*Judgment affirmed in part and reversed in part. Barnes, J., and Pope, Senior Appellate Judge, concur.*

DECIDED NOVEMBER 20, 2002.

*James E. Staples, Jr.,* for appellant.
*Jerry C. Tootle, Jr.,* for appellee.